**Taylor Ted EMERY and Claude Bellar, Appellants,**

v.

**The ROBERTSON COUNTY ELECTION COMMISSION et al., Appellees.**

Supreme Court of Tennessee.

Sept. 4, 1979.

Rehearing Denied Sept. 17, 1979.

Arthur E. McClellan, Gallatin, William B. Vest, Kelly, Jones & Vest, Hendersonville, J. Travis Price, Springfield, for appellants.

Michael R. Jones, James E. Walton, Joe K. Walker, Springfield, for appellees.

## OPINION

FONES, Justice.

This appeal, in two consolidated cases, involves the validity of the August 1978 election contests for the office of Sheriff of Robertson County and for the two Fourth District positions on the Robertson County Commission.

The Election Commission certified that Dan King was elected Sheriff by a margin of eighty-two votes over plaintiff Taylor Ted Emery and that Charles Dorris, with 453 votes, and Russell Shedden, with 342 votes, were elected to the County Commission for the Fourth District. Plaintiff Claude Bellar received 341 votes and a fourth candidate received twenty-three votes in the County Commission race.

In a written opinion rendered on 22 September 1978 the learned Chancellor voided sixty-eight votes and found that two eligible voters were illegally barred from casting their ballots. In addition, the Chancellor found five categories of irregularities, but concluded that the vote totals were not affected thereby. The Chancellor's comments about those irregularities are significant:

"The Court, upon a review of the testimony involving these five irregularities does not believe there has been a showing, by a preponderance of the evidence, that any one of these five instances or occurrences did in any wise effect the outcome of the election or influence the vote of any person who voted where these things occurred. This does not mean that these acts are to be condoned; it is this Court's position as it should be the position of all persons charged with the responsibility of fair elections, that no person should be within the 100 foot distance and be in a position to have someone believe that he may or may not be trying to influence a vote or the operation of the election process. These statements are directed to the Election Commission and/or the officials that operate the polls for Robertson County. The acts such as these five cannot be tolerated nor can they be condoned with the thought that they may or may not affect the outcome of any election. No Court should be charged with the responsibility of having to find a fact as to whether any of these five improprieties did affect the popular election of any candidate. The Court has determined that these five occurrences did not violate the election process so as to cause any ballot to be cast out, but how sad it is that it was necessary for this decision to be made and for those of another persuasion to believe that this affected the outcome of any race in Robertson County."

The trial court then expressed the opinion that in the absence of fraud, the election could only be voided in those races in which the number of void votes cast could mathematically affect the result. Thus, in the Sheriff's race, sixty-eight votes deducted from King's total and two added to Emery's total left King with a twelve-vote margin of victory, and Emery's suit was dismissed. In the County Commission race in the Fourth District, the trial court dismissed

the suit as to Dorris, without comment, but implicitly, because Dorris' 112-vote margin would require the same result as King's eighty-two-vote margin, plus the fact that of the seventy rejected votes, many were cast outside the Fourth District. With respect to the second position from the Fourth District, the trial judge directed a recount between Bellar and Shedden by the Election Commission (which he noted would only be possible with absentee ballots) or, if a recount proved to be impossible, that their names be placed on the ballot as contestants in the November election. On that same day, September 22, 1978, the Court entered a decree in the County Commission case directing the Election Commission to place the names of Bellar and Shedden on the November ballot, presumably having made the determination that a recount was impossible.

On October 11, 1978, the trial judge filed a supplemental opinion, prefaced as follows:

"In rendering the original opinion on September 22, 1978, this Court failed to give specific reference and treatment to the reasons for the setting aside of the Commissioner's election in the 4th district of Robertson County, Tennessee."

After discussing and analyzing a number of reported decisions, the Chancellor's opinion concludes as follows:

"The Court would list those voter irregularities in the 4th District Commissioner's race of Robertson County, Tennessee as follows:

1. Absentee ballots counted which were admittedly void.

2. The disenfranchisement of two voters without cause.

3. Allowing votes to be cast by persons residing outside the 4th District for more ,than 90 days prior to the election date.

4. Allowing votes to be cast by persons who were residents of another county for more than 90 days prior to the election date.

If only one of these irregularities had occurred, it might well be said that it was, or they were honest mistakes as the

term was used in the case of *Ingram v. Burnette* [204 Tenn. 149], *316 S.W.2d 31, 33* :

It is not any easy task for the courts of our State to set aside and declare elections void. The Courts appreciate the fact that honest mistakes will be made in the conduct of elections.

What we have are a multiplicity of mistakes and/or irregularities and the magnitude of these causes this Court to order a new election as between Mr. Shedden and Mr. Bellar."

Emery contends that in the Sheriff's race there was sufficient evidence of fraud and illegality to require a declaration that the election was void because of incurable uncertainty. Bellar makes the same contention with respect to the Fourth District race. In addition, Bellar insists that the Chancellor, in his supplemental opinion, expressly found that the magnitude of the mistakes and irregularities in the Fourth District required a new election because of incurable uncertainty, but erred in failing to void the election as to Dorris; that an election could not be valid as to one candidate and void as to others, in the same race, for the same offices, at the same ballot box.

## I.

Included in the sixty-eight witnesses who testified in this case were the following election officials: Martha Ralph, Chairman of the Absentee Counting Board; Mary Sprouse, Registrar at Large; and Joe Henry Carter, Chairman of the Robertson County Election Commission.

The evidence revealed that Martha Ralph had been Chairman of the Absentee Counting Board for seven years and that in the August General Election a total of 628 absentee votes were cast and only four were rejected. The Chancellor rejected twenty-three additional absentee ballots, based upon various irregularities appearing on the face of the voters' affidavits to their absentee ballot. Mrs. Ralph testified that she thought only one witness was required to the signature of a person signing for an

absentee voter unable to write his signature or make his mark. *But see* T.C.A. § 2–605. However, a number of such absentee ballots having no witness' signatures thereon were counted by the Absentee County Board. She also was unaware of the provisions of T.C.A. § 2–618(b) requiring the Absentee Counting Board to compile a list of rejected absentee ballots so that the Registrar could advise the voters of such rejections. The Chancellor rejected an additional twenty-two absentee ballots, but the reasons for said rejection were not facial defects that should have been discovered by the Absentee Counting Board. Also included among the absentee ballots counted by the Board and rejected by the Chancellor was the absentee ballot of Mary Sprouse, the Registrar at Large, who took her own oath and signed her own absentee ballot as an attesting official.

Mary R. Sprouse had been employed by the Robertson County Election Commission for almost fourteen years at the time of the trial. The evidence showed that she failed to record the answers to five questions on the applications for permanent registration of 279 voters who voted in the August 1978 election. We agree with the Chancellor that those voters should not be disenfranchised because of failure of the Registrar to perform her duties properly.

Perhaps the most appalling dereliction of duty in this record is exemplified by the evidence that the Registrar handed to Dan King, the incumbent Sheriff and candidate for re-election, twenty-five applications for absentee ballots, and she or a deputy registrar gave fifteen to one William Ellis, and she testified that she would have given anyone who asked for them as many as they requested. Such acts were in direct violation of T.C.A. § 2–607. The Registrar's testimony about the handling of the absentee ballot applications is significant:

"Q. Did the Commission make you aware of the statute that provides that no more than one application for absentee voting may be furnished to any voter?

THE COURT: Mr. McClellan, there's nothing wrong with your question. But sometimes when you ask too long a question, the witness will answer it; but otherwise they don't understand it.

### EXAMINATION CONTINUED BY MR. McCLELLAN:

Q. You haven't received any instructions about the applications in terms of giving them out. Is that correct?

A. No.

Q. Have you or people within the office, from your personal observation, dispensed numerous applications for absentee ballots to one voter? What I'm asking is—

A. Anyone came in to get an application, we let them have it. Is that what you're asking me?

Q. No, ma'am. What I'm asking is did you give Mr. King over here a handful of applications?

A. I gave him as many as he asked for.

Q. Did you give other people as many as they asked for?

A. Anybody that asked for them, we gave them."

This Court in *Hilliard v. Park*, 212 Tenn. 588, 370 S.W.2d 829 (1963), gave extensive consideration to the question of absentee voting irregularities in applying the absentee voting laws then in effect. Ch. 380, 1963 Tenn.Pub.Acts, then codified at T.C.A. § 2–1601 *et seq.*

The purpose section of the 1963 Absentee Voting Act provided in part:

"It is declared to be the intent of the general assembly . . . to prevent fraud in elections . . . election officers shall receive no absentee voter's ballot unless the provisions of this Act shall have been literally complied with, all regulatory provisions hereof being made mandatory . . . ." Ch. 380, § 1, 1963 Tenn.Pub.Acts.

The *Hilliard* court interpreted that language as evincing an intent on the part of the Legislature that the absentee voting statutes be given a strict rather than a liberal construction. The Court also examined and quoted from decisions of other states and concluded that the great majori-

ty of jurisdictions adhered to the same rule. Typical of the quotes approved is the following:

" 'Election laws should be construed liberally in favor of the right to vote but this is not the rule as to absentee voting laws. Being in derogation of the common law, they should be strictly construed. The reason for the difference is that purity of the ballot is more difficult to preserve when voting absent than when voting in person. *Guice v. McGehee*, 155 Miss. 858, 124 So. 643, 125 So. 433; *Straughan v. Meyers*, 268 Mo. 580, 187 S.W. 1159; *In re Baker*, 126 Misc. 49, 213 N.Y.S. 524; *Opinion of Justices*, 44 N.H. 633.' " 370 S.W.2d at 832, *quoting from State ex rel. Whitley v. Rinehart*, 140 Fla. 645, 192 So. 819 (1940).

The purpose section of the 1972 Act, applicable to this case, provides in part as follows:

"To prevent fraud in elections no voter's absentee ballot may be received unless the provisions of this chapter are strictly complied with." Ch. 740, § 1, 1972 Tenn. Pub.Acts.

Obviously, the language of the 1972 Act expressly requires a strict construction of the absentee ballot statutes, consistent with the Court's ruling in *Hilliard.*

King admitted obtaining twenty-five applications for absentee ballots from the Office of the Robertson County Election Commission. He acknowledged delivering applications to Jeanette Swift, Ernest Crabtree and Edna McClurkan and remembered, "carrying several applications to different people." Edna McClurkan and William Ellis both work at the Springfield Healthcare Nursing Home. Sheriff King testified that when he delivered applications to Mrs. McClurkan, they "had already had a social worker to complete this process there." Presumably that was William Ellis who had obtained fifteen applications. The Chancellor rejected fifteen absentee ballots cast by voters at the nursing home, apparently accounting for those applications obtained by Ellis.

The evidence shows that Jeanette Swift's efforts resulted in seven absentee ballots cast by the Shannons, the Templetons and the Gruggs; that William Duffer, the Chief Deputy Sheriff and also a notary public, was dispatched by Sheriff King in a county vehicle to take the oaths of the Shannons, the Templetons and the Grubbs. Sheriff King testified that he "believed" that Mrs. Swift had handcarried those seven absentee ballots to his office and he carried them to the election office, another violation of the absentee voting statutes. Those seven ballots were also rejected by the Chancellor.

Joe Henry Carter, the Chairman of the Robertson County Election Commission, acknowledged that he was a known supporter of Sheriff King. From this cold record, it appears that it was with some reluctance that he acknowledged that it was improper for King and Ellis or anyone else to receive more than one application for absentee voting. He was asked about the extent of instructions and seminars given to commission members, registrars and election officials. Suffice it to say that the evidence adduced shed no light whatever upon the question of why such glaring irregularities occurred.

Ernest Crabtree held a special commission from Sheriff King and contributed money to his campaign. He testified that King gave him applications on two different occasions. He said that "a fellar came by and said he had six or seven people that wanted absentee ballots." No names were given. Apparently the other occasion resulted in his obtaining applications that were given to Phillip, Ray and Sherry Henderson, who voted absentee. The three Henderson votes were rejected by the Chancellor.

## II.

 The reported decisions of this State uniformly authorize the courts to void an election where the evidence reveals that the number of illegal ballots cast equals or exceeds the difference between the two candidates receiving the most votes. The rule is based upon the rationale that if all of the

illegal votes had been cast for the unsuccessful candidate the result would have been changed. *See, e. g., Ingram v. Burnette, supra, Hilliard v. Park, supra.* In *Southall v. Billings,* 213 Tenn. 280, 375 S.W.2d 844 (1963), Mr. Justice White, writing for the Court, suggests that such a mathematical purging of votes renders the election void because of the uncertainty of result. *Id.* 375 S.W.2d at 850.

█ The courts may also void elections upon a sufficient quantum of proof that fraud or illegality so permeated the conduct of the election as to render it incurably uncertain, even though it cannot be shown to a mathematical certainty that the result might have been different.

In *State ex rel. Davis v. Kivett,* 180 Tenn. 598, 177 S.W.2d 551 (1944), this Court affirmed the trial court's voiding of an election in Claiborne County wherein the successful candidate was shown to have contributed to a fund used to purchase over 4,000 poll tax receipts in bulk, as distinguished from individual purchases. In addition, the Chancellor had found such irregularities of the Springdale precinct that the entire vote of that box was cast out. The Chancellor had found "many violations of law and many of the safeguards surrounding the election were disregarded, especially at Springdale and Fork Ridge, so much so as to render the election incurably uncertain, thus rendering it impossible to purge the returns. It results that a decree will be entered declaring the election void and taxing defendant with the costs." *Id.* 177 S.W.2d at 554.

Justice Gaylor writing for the Court concurred in the Chancellor's finding with the observation that,

"[T]he election for County Judge was so permeated with fraud and illegality as to compel the conclusion that it was not in fact, an expression of the will of the electors . . . ." *Id.* 177 S.W.2d at 555.

*See, e. g., Southall v. Billings, supra; Ingram v. Burnette, supra.*

In *Kivett* there was proof of actual fraud as well as violations of the election statutes. In *Ingram* a single fraudulent scheme resulted in 138 persons voting illegally in the election. In *Southall* the complaint that was dismissed in the trial court on demurrer, but held sufficient by this Court, contained allegations of actual fraudulent acts as well as violations of the statutes.

In this case, we agree with the Chancellor that there is no evidence that would justify a finding of fraudulent intent on the part of any of the officials or candidates. This gives rise to the question of whether any election can be declared void, upon a showing of illegalities and irregularities, absent actual fraud.

█ The first purpose declared by the Legislature in enacting our present election laws was that "[t]he freedom and purity of the ballot is secured." T.C.A. § 2–102(a). The integrity of the ballot is jeopardized upon violation of any of the procedural safeguards that the Legislature has included in the election laws, which are obviously designed to (1) prevent undue influence or intimidation of the free and fair expression of the will of the electors or (2) insure that only those who meet the statutory requirements for eligibility to vote, cast ballots. A ballot cast in violation of statutory safeguards falling within those categories affects the freedom and purity of the ballot to exactly the same extent as a ballot tainted with actual fraud, as in *Ingram.* Violations of those statutes, such as the absentee voting statutes, present the opportunity for fraud, whether committed or intended. *See Larson v. Locken,* 262 N.W.2d 752 (S.D. 1978). Thus, whether there is proof of actual fraud only, or violations of statutory safeguards only, or a combination of the two, the issue is whether or not those acts, viewed cumulatively, compel the conclusion that the election did not express the free and fair will of the qualified voters. *See Johnson v. Trnka,* 154 N.W.2d 185 (Minn. 1967).

III.

█ The irregularities found by the Chancellor in the Fourth District fall within

the two categories of statutory safeguards discussed above, and we concur in said findings. However, we think it was inconsistent to hold that the irregularities voided only that portion of the election involving Bellar and Shedden.

The proof shows that thirty-seven absentee ballots were cast in the Fourth District and that at least eleven, if not more, of the absentee ballots rejected were cast by Fourth District voters. Thus, the Chancellor could have voided the certification of Shedden, who had only one more vote than Bellar, on that simple mathematical calculation and his supplemental opinion of October 11, 1978, would have been unnecessary.

But the new election was ordered on different grounds, to wit, irregularities of such magnitude that the election in that district was rendered incurably uncertain. The irregularities found by the Chancellor were of such a nature that it was impossible to say that they affected the vote for candidates Bellar and Shedden but did not affect the vote for candidate Dorris, or that they did not affect the vote in the Sheriff's race.

Sheriff King received a total of 495 votes and Emery 231 in the Fourth District, giving King a margin of 264 votes. Thus upon casting out the entire vote in the Fourth District, King's eighty-two-vote margin disappears, and Emery has a margin of 182 votes in excess of King. Obviously, the Sheriff's race is rendered incurably uncertain by voiding the vote in the Fourth District.

The Sheriff's race must be voided for another reason. The Chancellor's vote purge left King with a twelve-vote margin of victory. Tracing the forty absentee ballot applications given to Sheriff King and William Ellis, we conclude from the record that all fifteen of Ellis' applications were involved in the nursing home rejections, and ten of the twenty-five King applications were rejected, leaving fifteen unaccounted for. We think it is appropriate and necessary that an additional fifteen votes be declared void in the Sheriff's race because of the personal participation of the candidate in violation of the absentee voting statutes.

The result is that the Sheriff's election and the August and November elections for two positions on the Robertson County Commission from the Fourth District are voided, and the respective offices are declared vacant. *See Southall v. Billings, supra; Stambaugh v. Price*, 532 S.W.2d 929 (Tenn.1976). Until the next election the vacancies will be filled by such persons as may be appointed by the county legislative body, and the clerk of this Court will certify this judgment to that body in accord with T.C.A. § 8–2806. Tenn.Const. Art. 7, § 2.

Costs are adjudged against the Robertson County Election Commission.

HENRY, C. J., and COOPER, BROCK and HARBISON, JJ., concur.