IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 22, 2008 Session

## BOBBY C. (CLARK) KING v. SEVIER COUNTY ELECTION COMMISSION, ET AL.

Appeal from the Chancery Court for Sevier County
No. 07-5-181      Telford E. Forgety, Jr., Chancellor

No. E2007-02355-COA-R3-CV -  FILED JULY 31, 2008

This case arises from an election for Gatlinburg City Commission in May 2007. Six candidates were on the ballot; the top three finishers were elected. Bobby C. (Clark) King received 210 votes and finished fifth, 304 votes behind the third-place finisher. Mr. King now seeks to have the election declared void, and a new election ordered, on the basis of several alleged procedural errors that he says render the election results invalid. After a bench trial, the court rejected Mr. King's arguments, declaring some of his accusations factually lacking and holding that others, even if true, were not sufficiently serious to justify voiding the election. Mr. King appeals. We affirm.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

David A. Stuart, Clinton, Tennessee, for the appellant, Bobby C. (Clark) King.

Robert H. Watson, Jr., and Nathan D. Rowell, Knoxville, Tennessee, for the appellees, Jerry Hays, Mike Helton and Mike Werner.

Dennis B. Francis, Knoxville, Tennessee, for the appellees, Sevier County Election Commission, Paul Bollinger, J.B. Matthews, Ava Hornung, Joe Newman and Elizabeth Pierce.

**OPINION**

I.

Mr. King was one of six candidates in the nonpartisan, vote-for-three election for Gatlinburg City Commission on May 15, 2007. The three winning candidates received 639 votes, 577 votes and 514 votes, respectively. The fourth-place candidate received 257 votes. Mr. King, the fifth-place candidate, received 210 votes. The sixth-place candidate received 183 votes. Mr. King filed suit

to contest the election. The defendants include the winning candidates, the Sevier County Election Commission, and the commission's members. For simplicity and ease of understanding, we will refer to the defendants simply as "the county."

Mr. King alleges that the election is invalid because, according to him, the pre-election procedures violated several statutory requirements. Specifically, he claims: that Sevier County's non-standard voting machines were not properly approved by state elections officials; that county officials failed to mail required notices to the political parties regarding when and where the voting machines would be examined; that the two voting machine technicians conducting the examination, one a Republican and one a Democrat, failed to do so "jointly," as the Republican technician was frequently absent due to illness; that certificates indicating the machines had been properly prepared for the election were inadequate under the statute; and that a requirement regarding the storage of "keys for each machine" was not followed (because the machines in question do not *have* individualized keys).

As stated by the Supreme Court in 1983,

> Tennessee law empowers a court to void an election on two alternative, but closely related bases. First, "upon a sufficient quantum of proof that fraud or illegality so permeated the conduct of the election as to render it incurably uncertain, even though it cannot be shown to a mathematical certainty that the result might have been different." ***Emery v. Robertson County Election Com'n***, 586 S.W.2d 103, 109 (Tenn. 1979) . . . Secondly, where some ballots are found to be illegal, the number of illegal votes cast is equal to, or exceeds, the margin by which the certified candidate won.

***Millar v. Thomas***, 657 S.W.2d 750, 751 (Tenn. 1983). Mr. King attempts to cast his challenge as falling within the second category rather than the first category, apparently because he believes he can more easily prove that the "number of illegal votes cast is equal to, or exceeds, the margin by which the certified candidate won" than that "illegality so permeated the conduct of the election as to render it incurably uncertain." Mr. King argues that "every [alleged] statutory violation . . . goes to the integrity of the entire ballot and [therefore] the votes are *all* illegal or invalid, thereby exceeding all the margins." (Emphasis added.) "With every ballot on every machine being an illegal ballot," he writes, "every vote is an illegal vote[.]" For reasons that we will discuss in more detail later in this opinion, we think this argument misapprehends the distinction between the two bases for voiding an election. In our view, Mr. King's allegations are properly viewed as a claim that "illegality so permeated the conduct of the election as to render it incurably uncertain."

Pursuant to Tenn. R. App. P. 13(d), "review of findings of fact by the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." As for the trial court's conclusions of law, the review remains *de novo*, but with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993).

We will begin by addressing Mr. King's allegation that the county did not receive the required state approval for the voting machines in question. We will then proceed to consider his other allegations.

II.

On the issue of voting machine approval, Mr. King points to the statute governing the "[u]se of non-standard machines" and argues that county officials violated it.[1] The statute reads, in pertinent part, as follows:

> The county election commission, with the approval of the coordinator of elections and the state election commission, may provide for the use of voting machines which do not meet the requirements of this title except under this section.

Tenn. Code Ann. § 2-9-110(a) (2003). As can be seen, the statute does not outline any specific requirements for what *form* the requisite state "approval" must take. Accordingly, the question before the court is simply whether the county's use of the subject "non-standard," electronic voting machines was, in fact, "approv[ed]" by the state.[2] The trial court held that the machines were so approved.

At trial, Mr. King called former Sevier County election administrator Pamela Flynn to the stand and asked her, "Do you have records showing that the [state] coordinator of elections and the State Election Commission approved these particular machines?" Ms. Flynn replied, "Yes," and then presented a faxed letter from the state elections coordinator as "the original documentation that we got." The three-page document, printed on state Division of Elections letterhead, indicates that it was faxed from the "ELECTIONS DIVISION" and sent to various county elections officials. The document is unsigned. Ms. Flynn testified that she was "not sure" if the state elections coordinator "signed the cover page," which is not in the record. In any event, after eliciting this testimony from Ms. Flynn and being handed the document by the commission's attorney, Mr. King asked the trial court to move the document into evidence as Exhibit 2.

On appeal, Mr. King argues that the document "is not certified or authenticated in any way, and is not a self-proving or self-authenticating document that could come into evidence on its own." In response, the county points out that the document was offered into evidence *by Mr. King*, and he raised no qualms about its admissibility; thus, he cannot now object to the document's admissibility. The county is correct on this point. "It has long been the general rule that questions not raised in the trial court will not be entertained on appeal." *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn.

---

[1] It is undisputed that "non-standard" voting machines were used in the election, and therefore approval was required, lest the county be in violation of of Tenn. Code Ann. § 2-9-101 (2003), which lists the "specifications" for *standard* voting machines.

[2] This court has upheld the constitutionality of using electronic voting machines. *See Mills v. Shelby County Election Com'n*, 218 S.W.3d 33, 40 (Tenn. Ct. App. 2006).

1983).  *See also* Tenn. R. App. P. 36(a) ("[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

Mr. King responds by asserting in his reply brief that his "argument is not as to the admissibility of Exhibit 2."  This is a strange statement, given that Mr. King's initial brief clearly frames the issue in terms of admissibility, including an extensive, almost three-page-long excerpt from the Tennessee Rules of Evidence concerning "authentication as a condition precedent to admissibility[.]"  Tenn. R. Evid. 901, 902.  Moreover, Mr. King's discussion of whether the document is "certified or authenticated in any way" can only be understood as an evidentiary argument, since the statute providing the pertinent substantive law – the previously cited Tenn. Code Ann. § 2-9-110(a) – requires only "the approval of the coordinator of elections and the state election commission," and does not indicate that this "approval" must be "certified or authenticated."  In any event, since there is no substantive statutory requirement regarding the document's form, and since any evidentiary objection was waived below, Mr. King's argument regarding "certification" and "authentication" must fail.

Perhaps anticipating this result, Mr. King shifts his argument in his reply brief to focus more clearly on the document's *sufficiency*, as opposed to its admissibility.  He asks the court to conclude that "Exhibit 2 does not constitute sufficient evidence of approval of these non-standard machines." Yet Mr. King has the burden of proof backwards: as the plaintiff, *he* must present sufficient evidence that the county did *not* get the requisite approval.  This he has not done.  Moreover, his argument that the sufficiency of the evidence "can be determined as a matter of law from the face of the exhibit" is incorrect.  The exhibit is not the only relevant evidence on this point.  The oral testimony of Ms. Flynn, who produced the document in question and discussed its contents, is also relevant and undoubtedly affected whether the trial court believed that the county received the requisite state approval.  We defer to the trial court on such matters, as it "is uniquely positioned to observe the manner and demeanor of witnesses." **Fell v. Rambo**, 36 S.W.3d 837, 846 (Tenn. Ct. App. 2000). For all of these reasons, it is clear that the record does not preponderate against the trial court's conclusion that Mr. King failed to prove any violation by Sevier County of the § 2-9-110(a) "approval" requirement.  This issue is without merit.[3]

---

[3] Mr. King's argument that we should declare the use of these machines illegal because they "do not provide as much protection for the purity of the ballot and against election fraud" is likewise without merit. Mr. King has not proven this allegation.

III.

Mr. King's four other issues all relate to highly technical procedural requirements governing the preparation of voting machines prior to the election. Two of these issues are factually unsupported on this record, as we will explain momentarily. As for the other two issues, we agree with the trial court that, even if accurate, the alleged violations do not justify voiding the election.[4]

One of Mr. King's allegations is that the county violated Tenn. Code Ann. § 2-9-105(d) (2003), which states that "[t]he keys for each machine shall be sealed in an envelope showing the location where the machine is to be used, the number of the machine, the number on the protective counter, and the seal number." No such action was taken with the electronic machines, because, by design, they *do not have keys*.[5] It seems to us that the sealed-keys requirement is necessarily waived by the state's approval of these "non-standard" machines. Tenn. Code Ann. § 2-9-110(c) states that approved non-standard voting machines "shall be as valid for all purposes in an election as if the machines had otherwise met the requirements of this title for voting machines." § 2-9-105(d), requiring sealed keys, is part of "this title." Thus, while the use of keyless machines cannot "otherwise me[e]t the requirements" of the statute's key-related provisions, those provisions are waived by state approval of such non-standard machines under § 2-9-110, and the machines are consequently "as valid" as if the waived requirements had been met. Accordingly, no statutory violation has been proven.

Another claim by Mr. King asserts that the county violated Tenn. Code Ann. § 2-9-105(c), which requires that each machine be certified after inspection, and that the certification must state "the number of machines, whether all of the machines are set at zero (000), the number registered on each protective counter and the number on each metal seal with which the machines are sealed." The "Technician's Certification," in the record as Exhibit 1, is self-evidently in compliance with every aspect of this rule except for the requirement that it state "whether all of the machines are set at zero (000)."[6] The only disputed question is whether that one particular requirement was violated. We find that it was not. The certification document states that each machine has "been properly prepared, *Cleared* and Tested, Sealed, and [is] ready for [the] City of Gatlinburg Municipal Election." (Emphasis added.) It is evident to us that setting a machine to "zero (000)" could sensibly be referred to as "clearing" the machine. Mr. King is quibbling over semantics. The statute does not mandate a particular wording, but rather the certification of an action, and the wording herein is more than adequate to certify that action. The certification document is in full compliance with the statute.

---

[4] This same analysis would apply to the first two issues as well, if violations had been proven.

[5] There are "keys" that lock the machines into their stands, but those keys are not unique to the machine and have nothing to do with whether the machine functions; *i.e.*, they do not "lock" the machines. Thus, they have no applicability on this point, as they are manifestly not the type of "keys" that the statute refers to.

[6] Mr. King claims that the "metal seal" provision was also violated because these machines are sealed with plastic, not metal. However, this argument fails for the same reason just stated with regard to the lack of keys on approved, non-standard machines.

That leaves two remaining alleged violations: of Tenn. Code Ann. § 2-9-105(b), which mandates that the county election commission "mail notices to the chairs of the county executive committees of the political parties and to independent candidates stating where and when the [voting] machines will be examined"; and of § 2-9-103(e), which states that the technicians performing the above-described examination, who are appointed by each political party on the commission, must perform their duties "jointly." The latter provision was allegedly violated because the Republican-appointed technician, who was undergoing chemotherapy, was absent approximately 75 percent of the time, while the Democrat-appointed technician was present at all times. The former provision was allegedly violated because the county – apparently acting with the approval of state officials – published notice in local newspapers, at its office and by phone, but not via mail to the party chairs.

It seems clear that, on the facts in this record, a technical violation of § 2-9-105(b) occurred, whether or not it was authorized by state officials (who, of course, do not have the authority to override statutory requirements, unless the statute specifically grants them that authority). We are less sure that § 2-9-103(e) was violated, since it seems at least plausible that the technicians' mutually agreed-upon arrangement – with the ill technician stopping by "on occasion" to "check on [the other technician] to make sure that everything was going fine" – might constitute "joint" performance of their statutory duties. However, we will assume *arguendo* that this requirement, too, was violated. The fact remains that neither of these alleged violations are nearly serious enough to warrant voiding the election.

"Courts should be . . . reluctant to take the step of declaring an election invalid." ***Forbes v. Bell***, 816 S.W.2d 716, 724 (Tenn. 1991). "The Courts appreciate the fact that honest mistakes will be made in the conduct of elections." ***Ingram v. Burnette***, 316 S.W.2d 31, 33 (Tenn. 1958). "The whole object of our election laws passed by the Legislature over the years has been with the idea of maintaining fair and honest elections." ***Id.*** Where, as here, the alleged violations are highly technical in nature, and there is no allegation whatsoever of deliberate or purposeful misconduct, nor even any particularized claim of harm, we are especially loathe to disturb the expressed will of the voters. "[N]ot every irregularity, or even a combination of irregularities, will necessitate the invalidation of an election." ***Forbes***, 816 S.W.2d at 724.

In reaching this conclusion, we do not condone violations of election statutes, even "highly technical" ones. Elections officials have a duty to follow the law, and to the extent that present practices do not comport with statutory requirements, those practices should be changed to bring them into compliance with the law. However, voiding an election is an extreme remedy. As the Supreme Court stated in ***Forbes***, courts will only void an election on the basis that it was "so permeated with fraud [or][7] illegality that it cannot be said to fairly reflect the will of the voters" when the alleged wrong is

---

[7] The quoted text uses the word "and," not "or." However, the test upon which the Court in ***Forbes*** relied, first announced in ***Emery***, 586 S.W.2d at 109, uses the disjunctive form: "fraud or illegality." ***Forbes*** initially quotes this language correctly, but then later in the opinion, uses "and" and "or" interchangeably. For ease of understanding, we have changed "fraud and illegality" in this quote to "fraud or illegality," since this is the correctly stated test.

so gross and palpable a failure of the opportunity for a free and equal expression of the popular will, that the courts cannot permit the election to stand. Honest mistakes or mere omissions, or irregularity in directory matters – even though gross – if not fraudulent, *will not void an election unless they affect the result or at least render it uncertain*.

* * *

In reviewing a complaint that does no more than allege statutory violations . . . the focus of the court's inquiry must be kept in mind – that is, *whether the violations are so serious as to thwart the will of the community upon a particular question*.

* * *

*[T]echnical non-conformity with election statutes will not necessarily void an election*, as "such strictness would lead to defeat rather than uphold, popular election, and can not be maintained." Invalidating an election solely on the basis of technical omissions, much like failing "to cross a 't' or dot an 'i'," would effectively disenfranchise voters.

*Id.* at 720-21 (citations omitted; emphasis added) (quoting **McCraw v. Harralson**, 44 Tenn. 34 (1867)). Thus, although the plaintiff in **Forbes** alleged some fairly serious violations relating to the improper use of paper ballots,[8] the Supreme Court held that the "permeated with fraud or illegality" standard was not met. In the instant case, wherein the alleged violations are more technical and less serious, we certainly cannot conclude, in accordance with **Forbes**, that this election was "so permeated with . . . illegality" as to justify voiding the election.

Mr. King, presumably recognizing that he cannot win under the law announced by **Forbes**, tries to extricate himself from the reach of that precedent through a clever logical device. He contends that he is *not* claiming the election was "permeated with fraud or illegality," but rather, that the "number of illegal votes cast is equal to, or exceeds, the margin by which the certified candidate won." 816 S.W.2d at 720. He argues that "the votes are *all* illegal or invalid, thereby exceeding all the margins." (Emphasis added.) Because of the alleged statutory violations, he claims that "every

---

[8] Specifically, as later summarized in **Stuart v. Anderson County Election Comm'n**, 237 S.W.3d 297, 305 (Tenn. Ct. App. 2007), the allegations in **Forbes** included: "(1) the improper utilization of paper ballots in conjunction with voting machines when the voting machines were not out of order; (2) paper ballots at one precinct being cast in violation of the statute rendering all 153 ballots 'illegal'; (3) allowing ballot boxes to be unlocked in violation of Tenn. Code Ann. § 2-7-109; (4) voters using paper ballots not being provided private voting compartments as required by relevant statutes; (5) voters using paper ballots turning in the ballots to election officials, as opposed to depositing them into a locked box; and (6) lines of voters were allowed to accumulate at one precinct because the election officials did not strictly enforce the 'time limits for voters to use the voting machines thereby causing registered voters to leave the voting place without voting after a wait of at least one and a half to two hours.' "

ballot on every machine [was] an illegal ballot," and therefore "every vote is an illegal vote[.]" Thus, it is argued, the occurrence of statutory violations is enough, without more, to render the whole election null and void. Although he does not say so explicitly, Mr. King's argument necessarily implies that the election must be voided *regardless* of whether "the violations are so serious as to thwart the will of the community upon a particular question." **Id.**

In support of this novel theory, Mr. King points to Tenn. Code Ann. § 2-7-133 (Supp. 2007), the statute governing "Uncounted ballots," part of the chapter dealing with "Procedure at the Polling Place." The statute states: "Only ballots provided in accordance with this title may be counted. The judges shall write 'Void' on others and sign them." Tenn. Code Ann. § 2-7-133(a). Because "this title" refers to the entire Election Code, the alleged technical violations of § 2-9-105(b) and § 2-9-103(e) in preparing the voting machines mean, according to Mr. King, that all ballots cast on those machines are not "in accordance with this title" and therefore "may [not] be counted." Mr. King also points to language in *Emery* stating that

> [t]he integrity of the ballot is jeopardized upon violation of any of the procedural safeguards that the Legislature has included in the election laws, which are obviously designed to (1) prevent undue influence or intimidation of the free and fair expression of the will of the electors or (2) insure that only those who meet the statutory requirements for eligibility to vote, cast ballots. A ballot cast in violation of statutory safeguards falling within those categories affects the freedom and purity of the ballot to exactly the same extent as a ballot tainted with actual fraud[.]

586 S.W.2d at 109. Since the votes herein were, according to Mr. King, "ballot[s] cast in violation of statutory safeguards," he argues that they should all be thrown out.

If we were to accept Mr. King's logic, we would completely eviscerate the "permeated with fraud or illegality" category of election contests, and render *Forbes* a dead letter. No candidate would challenge a result under the exacting "permeated with . . . illegality" standard, which requires a showing that the "violations are so serious as to thwart the will of the community," if it were possible to win one's case simply by demonstrating *any* violation of the Election Code – and not necessarily a "serious" one – that makes each ballot, and therefore each vote, "illegal" in a highly technical sense. Such an outcome would be clearly averse to the reasoning of *Forbes*, which, as noted earlier, holds that "[t]echnical non-conformity with election statutes will not necessarily void an election, as 'such strictness would lead to defeat rather than uphold, popular election.' " 816 S.W.2d at 721. It would also run afoul of *Emery*, which states that "whether there is proof of actual fraud only, or violations of statutory safeguards only, or a combination of the two, the issue is *whether or not those acts, viewed cumulatively, compel the conclusion that the election did not express the free and fair will of the qualified voters*." 586 S.W.2d at 109 (emphasis added).

Mr. King makes no particularized claims of wrongdoing that relate to *specific ballots*, as contemplated by the "number of illegal votes cast" theory of recovery. Like the plaintiff in *Forbes*, he "does not charge fraud or tampering . . . nor claim that as a result of this irregularity any voter was

-8-

deprived of voting," 816 S.W.2d at 723, nor that any votes were changed. Instead, he charges simply that the whole election was flawed due to the procedural errors – precisely the sort of claim that the "permeated with fraud or illegality" theory is designed to encompass. This is the archetypal example of a "complaint that does no more than allege statutory violations." *Id*. at 720. It is for this reason that we treat Mr. King's claim as an allegation that the election was "permeated with . . . illegality," and follow the *Forbes* Court's directive to remember "the focus of the court's inquiry[:] . . . whether the violations are so serious as to thwart the will of the community."[9] *Id*. Having so focused our inquiry, we find nothing whatsoever to indicate that these violations are serious enough to pass that test.

Although a failure to notify party chairs of machine examination plans, and a failure by the party-appointed machine technicians to perform their jobs "jointly," could theoretically erode the safeguards that are designed to protect an election's integrity from the fraudulent influence of one party or another, there is absolutely nothing in this record to suggest that such was either the intent or the result in the instant case. This is particularly so given that this was a nonpartisan election, though that fact is not dispositive. The key point is that there is simply nothing in the record to suggest any *actual harm* to the integrity of the election, nor do we believe that these particular statutory violations, on these facts, are so intrinsically harmful to the integrity of the election as to require that it be voided.

These facts stand in stark contrast to the facts of several cases in which elections *have* been voided, such as *Shoaf v. Bringle*, 241 S.W.2d 832 (Tenn. 1951) (alleging, among other things, "intimidation and dures[s]" at the polls, and a conspiracy between officials and candidate to provide insufficient ballots in opponent's stronger precincts); *State ex rel. Davis v. Kivett*, 177 S.W.2d 551 (Tenn. 1944) (alleging a conspiracy to "steal the election" through intimidation and the use of fraudulent votes); and *Hollis v. State ex rel. Vaughan*, 237 S.W.2d 952 (Tenn. 1951) (alleging, again, a conspiracy to "steal the election," including by the procurement of "fictitious absentee ballots" and the printing of fraudulent ballots that omitted some candidates' names). Such are the sort of widespread irregularities that would justify a finding that an election was "permeated with fraud or irregularity." The allegations herein, even moreso that the allegations in *Forbes*, "pale by comparison with the egregiousness of the conduct reflected in the cases summarized above." *Forbes*, 816 S.W.2d at 722.

One excerpt from *Forbes*, discussing the specific allegations in that case, is particularly helpful in putting Mr. King's allegations into the proper context:

> The use of an unlocked ballot box, for example, would clearly contravene provisions in T.C.A. § 2-7-109. But Forbes does not charge fraud or tampering in this regard, nor claim that as a result of

---

[9] Alternatively, if we were to treat Mr. King's claim as falling under the "number of illegal votes cast" theory, as he desires, we would nevertheless hold that *Forbes* applies to cases under that theory with facts such as these. In either case, the result is the same: we must adhere to the Supreme Court's directive that, in cases that allege only statutory violations, the election will not be voided unless "the violations are so serious as to thwart the will of the community."

this irregularity any voter was deprived of voting. Similarly, the complaint alleges that voters using paper ballots were not provided with privacy, in violation of T.C.A. § 2-3-108(b)(1). That statute does set certain standards for the casting of a paper ballot, but again, there is no claim that as a result of the lack of "a private voting compartment," anyone casting a paper ballot was harassed, intimidated, or prevented from voting. Other alleged statutory violations appear even less weighty in terms of their effect on the integrity of the election. These include the appearance of blank signature lines on the poll sheets, which may have occurred because of a voter's inadvertence in skipping a line; the fact that voters may have been permitted to stay in the voting machines longer than the two minutes provided in T.C.A. § 2-7-118(a); and the failure to sign each tally sheet, in violation of T.C.A. § 2-7-132(b)[.]

*Id.* at 723-24. If the "use of an unlocked ballot box" and the failure to provide voters with privacy do not mandate the "conclusion that the election did not express the free and fair will of the qualified voters," *Emery*, 586 S.W.2d at 109, then certainly, the allegations in the instant case – which relate only to *pre*-election, machine-preparation procedures, several steps removed from the casting of actual votes – cannot be seen as doing so. The connection between these alleged procedural violations and any hypothetically possible disruption of the popular will is extremely tenuous at best.

IV.

For the above-stated reasons, we reject all of Mr. King's claims. The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Bobby C. (Clark) King. This case is remanded to the trial court for collection of costs assessed below, pursuant to applicable law.

_____
CHARLES D. SUSANO, JR., JUDGE

-10-