**David A. STUART**

v.

**ANDERSON COUNTY ELECTION COMMISSION, et al.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Nov. 5, 2008 Session.

Feb. 27, 2009.

Permission to Appeal Denied by Supreme Court Sept. 28, 2009.

David A. Stuart, pro se Plaintiff.

William A. Reeves, Knoxville, Tennessee, for the Appellee, Anderson County Election Commission.

Robert W. Knolton, Oak Ridge, Tennessee, for the Appellee, Don A. Layton.

## OPINION

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

This is the second appeal in this election contest brought by David A. Stuart ("Plaintiff"). Plaintiff lost the August 2006 general election for Anderson County General Sessions Court Judge, Division I, by a margin of 119 votes. In the first appeal, we determined that Plaintiff's complaint sufficiently stated a claim upon which relief could be granted to survive a Tenn. R. Civ. P. 12.02(6) motion to dismiss. We remanded the case to the Trial Court to determine if any of the votes at issue were "illegal" and, if they were, whether there was a sufficient number of "illegal" votes to merit a new election. On remand, the Trial Court determined that none of the votes at issue were illegal and upheld the validity of the election. Plaintiff appeals, claiming that there were thousands of illegal votes because voters exceeded the statutory time limit to vote and because many

voters were not asked to provide additional evidence of identification before voting. We affirm the judgment of the Trial Court.

### Background

In our Opinion in the first appeal we set forth some general background:

Plaintiff was a candidate for Anderson County General Sessions Court Judge, Division I, in the August 2006 general election. The opposing candidate was Don A. Layton ("Layton"). Layton received 6,966 votes, and Plaintiff received 6,847 votes. Thus, Plaintiff lost by a margin of 119 votes. Plaintiff timely filed this lawsuit contesting the election.

*Stuart v. Anderson County Election Comm'n,* 237 S.W.3d 297, 299 (Tenn.Ct. App.2007), hereafter referred to as "*Stuart I*".

In *Stuart I,* we explained that Plaintiff's complaint was premised upon allegations that the election should be set aside because it was null and void.[1] We then observed that when a contestant is claiming that an election is null and void, there are two bases upon which to proceed. Our Supreme Court discussed these two bases in *Forbes v. Bell,* 816 S.W.2d 716 (Tenn. 1991) as follows:

With respect to election contests seeking to have an election declared invalid, this Court has stated:

Tennessee law empowers a court to void an election on two alternative, but closely related bases. First, "upon a sufficient quantum of proof that fraud or illegality so permeated the election as to render it incurably uncertain, even though it can not be shown to a mathematical certainty that the result might have been differ-

ent." *Emery v. Robertson County Election Comm'n,* 586 S.W.2d 103, 109 (Tenn.1979); *see also State ex rel. Davis v. Kivett,* 180 Tenn. 598, 177 S.W.2d 551 (1944); *Ingram v. Burnette* 204 Tenn. 149, 316 S.W.2d 31 (1958). Secondly, where some ballots are found to be illegal, [and] the number of illegal votes cast is equal to, or exceeds the margin by which the certified candidate won. *Emery v. Robertson County Election Comm'n, supra; Hilliard v. Park,* 212 Tenn. 588, 370 S.W.2d 829 (1963).

*Millar v. Thomas,* 657 S.W.2d 750, 751 (Tenn.1983).

*Forbes,* 816 S.W.2d at 719–720.

The only issue in *Stuart I* was whether the Plaintiff's complaint stated a cause of action upon which relief could be granted sufficient to withstand a Tenn. R. Civ. P. 12.02(6) motion to dismiss. *Stuart I,* 237 S.W.3d at 299. We initially found that Plaintiff failed to sufficiently state a claim that "illegality so permeated [the] election 'that it cannot be said to fairly reflect the will of the voters.'" *Id.* at 305 (quoting *Forbes v. Bell,* 816 S.W.2d 716, 720 (Tenn. 1991)). That left us to consider whether Plaintiff stated a claim upon which relief could be granted based upon allegations that there were illegal ballots cast and that the number of illegal votes equaled or exceeded the margin of victory. We found that it did, stating:

Plaintiff's complaint is replete with allegations that many votes were illegal, why those votes were illegal, and that the number of those claimed illegal votes exceeds the margin by which defendant Layton won the election. In short, Plaintiff's complaint alleges that there are one hundred twenty plus illegal

---

1. The other method of challenging an election is to claim that the election was valid, but that the contestant would be the winner if the outcome was properly determined. *See*

*Forbes v. Bell,* 816 S.W.2d 716, 719 (Tenn. 1991). Plaintiff does not allege a challenge under this ground.

votes. Unlike the plaintiff in *Forbes,* Plaintiff's complaint did include a statement setting out the 119 vote margin of victory, and further included an allegation that the number of claimed illegal votes was sufficient so that the deduction of those votes from Layton's total "would have produced a different result or rendered the outcome in doubt." *Id.* at 720. It is not fatal to Plaintiff's complaint at this motion to dismiss stage that rather than stating a specific number of claimed illegal votes, Plaintiff instead alleges that the number of illegal votes exceeds the 119 vote margin of victory. Plaintiff's complaint, liberally construed, alleges that the number of claimed illegal votes is at least 120. Taking these factual allegations as true, which we must at this stage of the proceedings, Plaintiff's complaint does state a cause of action upon which relief can be granted on this second basis that the number of claimed illegal votes cast is 120 or more. Therefore, we vacate the Trial Court's dismissal of this action but only as to this sole basis. In so doing, we express absolutely no opinion on the merits of Plaintiff's case. On remand the Trial Court must determine whether any votes cast are illegal for the reasons claimed by Plaintiff and, if so, whether those votes cast that are determined to be illegal are equal to or exceed the margin of victory of 119 votes.

*Stuart I,* 237 S.W.3d at 306.

On remand, the Trial Court did as instructed.[2] Specifically, the Trial Court set

about to determine whether there were any "illegal" votes and, if so, whether the number of those illegal votes exceeded the margin of victory. The Trial Court was aided in this endeavor by the following stipulations made by the parties:

1. A total of 15,250 voters voted in the August, 2006, general election.

2. All 15,250 voters voting in the August, 2006, general election were registered voters.

3. No identification cards were required at the South Clinton voting precinct on Election Day, which was August 3, 2006.

4. Three hundred voters (300) voted on August 3, 2006, at the South Clinton precinct on Election Day.

5. At the South Clinton precinct, 137 voters voted for David A. Stuart, and 143 voters voted for Don A. Layton, on August 3, 2006.

6. Twenty paper ballots were issued to voters at Highland View precinct, with six votes being cast for David A. Stuart, and six votes being cast for Don A. Layton.

7. That none of the voting machines being used at the Highland View precinct had become out of order or were out of order at any time.

8. That the use of paper ballots at Highland View precinct was not authorized by the administrator of elections.[3]

---

**2.** Plaintiff claims that the Trial Court did not properly follow our instructions on remand. Contrary to Plaintiff's assertion, the Trial Court did exactly as it was instructed to do. We were quite clear in *Stuart I* that we were expressing "absolutely no opinion on the merits of Plaintiff's case" and that the Trial Court was to determine if any of the votes were "illegal," which is what the Trial Court did. *Stuart I,* 237 S.W.3d at 306. Simply because

Plaintiff disagrees with the Trial Court's ultimate ruling does not mean that the Trial Court did not do what it was supposed to do.

**3.** At the trial court level, Plaintiff claimed that these paper ballots also were "illegal" ballots. Out of twenty paper ballots that were cast, a total of twelve voters voted in the particular race at issue here. Six of these voters voted for Plaintiff, and the other six voted for Lay-

9. That no written report of the circumstances giving rise to the use of paper ballots at the Highland View precinct was filed with the Election Commission and grand jury.

10. The parties disagree as to whether all of the facts are relevant, and if so, as to the legal conclusion to be drawn there from (sic). (footnote added)

Following the trial, the Trial Court issued its decision from the bench. According to the Trial Court:

The Court has reviewed all of the filings in this case that's been with the Court for quite a while. . . . The parties filed a stipulation of facts, and those facts are conclusively proven and established by the Court. With regard to the evidence that I've heard here today, I think it can be basically said that from the proof here today the Court can conclude that one, at times during this election there were lines, maybe even long lines. The Court can also find from this election that at some precincts voters were asked to present documentary evidence of their identification. At some precincts the method of verifying their identification would be to verify their signature on the roster as it compared with the application for a ballot that the individual signed when he made his application to vote. I think that the Court can easily find that those matters have been conclusively proven. The question for the Court, after finding those facts, as well as the stipulation of facts, is to determine, as the Court of Appeals has indicated on its remand, is to determine if any of the votes in this election are illegal, as alleged in the plaintiff's complaint, and that is to reduce this to its simplest, are votes that are cast—are the votes that were cast that took longer

than five or 10 minutes, are those votes illegal? Are votes cast that were on paper ballots, are those votes illegal? And are the votes that were cast that the election official did not ask for documentary evidence, other than the comparison of their signatures on the roster of voters with the application of the ballot at that time, whether or not those votes are illegal votes. In determining whether or not they are illegal votes, the Court notes from the stipulation that with regard to the issue of the paper ballots, that there were 20 paper ballots that were issued at the Highland View precinct, with six votes being cast for candidate Stuart and six votes being cast for Don A. Layton. Establishing that as a proven fact, that issue becomes a nonissue. They cancel one another out.

The real issue in this case revolves around the time limits and with regard to the documentary evidence. Construing the statute . . . the statute requires the verification, and construing that statute the Court finds that the obligation of the election officials are, first and foremost, to compare the signature that's on the roster book with the signature that is on the application for the ballot. If those signatures are comparable to the satisfaction of the election commission, no further inquiry needs to be conducted by the election official. It's only when those signatures don't comport or there is a new application for a voter's signature that's not on that roster that any further documentary evidence would be required.

However, even if the Court is in error in this construction of this statute, I simply do not find it to be important for this reason: the parties have stipulated

ton. Since these votes cancelled each other out, on appeal Plaintiff has abandoned his

claim that these votes were illegal, and we express no opinion on this matter.

that all 15,000 plus voters who voted in this election were registered voters, and therefore there was not a vote cast by any voter that wasn't entitled to vote in this election. It would be incumbent for this statute to be violated to have any import in this election contest to show that someone whose signature or identity was not verified thereby cast a vote, and his vote or her vote should not have been cast. When we talk about illegal, the Court gets the concept or has relied on the concept that it's more than innocent negligence or misunderstanding. Illegal comports some mental component that you intend to do something that you're not allowed to do so, and you knowingly violate the law, such as knowingly voting when you don't have a right to vote. Therefore the Court finds that the complaint with regard to that allegation should be dismissed. And lastly, the questions of the time limits, the five minutes and the 10–minute votes, again, this complaint ... [does not allege that there are] voters that voted in this election that were not entitled to vote. The remedy that the plaintiff seeks [will result in the disenfranchisement of] all of those voters that took more than five minutes, the Court finds is not the import of that statute. To do so, to have that effect, would basically be to deprive an individual of his constitutional right to exercise a vote, a sacred right that all individuals have, basically for technical nonconformance of a time limit. The Court finds that the statute is intended to give the election officials some direction in moving the ballot along, not to set a rigid time period by which a person otherwise capable and entitled to vote should be disenfranchised because it takes longer to vote than the time limit. The Court finds that if in fact these statutes were violated by the election officials, that they would be no more than omissions of the election commission to ... dot an I ... and cross a T.... The remedy that the plaintiff requests for these technical noncompliance with the statute would be effectively to disenfranchise more than 7,000 people who voted in this election over the time period, without showing that any of those votes that exceeded the time limit were individuals that didn't possess the right to constitutionally vote in this election, and so therefore the complaint filed by the plaintiff is denied and dismissed....

Following entry of the judgment dismissing Plaintiff's claims, the Commission filed a motion to alter or amend the judgment asking the Trial Court to assess its costs and attorney fees against Plaintiff. Plaintiff also filed a motion to alter or amend the judgment. In his motion, Plaintiff essentially asked the Trial Court to reverse all of its findings and order a new election. The Trial Court denied Plaintiff's motion to alter or amend the final judgment. Although the Trial Court denied the Commission's request for attorney fees, discretionary costs were assessed against Plaintiff.

Plaintiff appeals claiming the Trial Court erred when it failed to order a new election even though thousands of voters exceeded the statutory time limits. Plaintiff also claims that the Trial Court erred when it failed to order a new election when there were more than 119 voters who were not required to submit documentary evidence of their identification. Finally, Plaintiff claims the Trial Court erred when it failed to grant his motion to alter or amend the judgment. The Commission claims all of the Trial Court's findings and ultimate decision were correct except one. Specifically, the Commission claims that the Trial Court erred when it refused to award the Commission its attorney fees.

The Commission asks us to reverse that determination and award its attorney fees incurred throughout this litigation, including this appeal, pursuant to Tenn.Code Ann. § 2–17–115. In addition, both the Commission and Layton claim that the appeal is frivolous and they should be awarded their attorney fees incurred on appeal pursuant to Tenn.Code Ann. § 27–1–122.

### Discussion

The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R.App. P. 13(d); *Bogan v. Bogan,* 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. of Educ.,* 58 S.W.3d 706, 710 (Tenn.2001).

■ Although Plaintiff raises several issues in his brief, there are two dispositive issues. The first issue is whether the Trial Court erred when it concluded that votes of those voters who exceeded the statutory time limit were not "illegal" votes for purposes of determining whether a new election is required. Tenn.Code Ann. § 2–7–118 (Supp.2008) [4] provides as follows:

**Time limit for voting—Removal of voter.**—(a) No voter who is voting without assistance may remain in a voting machine booth or occupy a voting compartment for more than five (5) minutes if other voters are waiting or more than ten (10) minutes in any event.

(b) If a voter refuses to leave after such time elapses, the officer of elections shall have the voter removed.

In the present case, the evidence introduced or stipulated to at trial shows that there were a total of 15,250 voters in the election. Of these 15,250 voters, 7,016 of them took longer than five minutes to vote, and 769 voters took longer than ten minutes. From a percentage standpoint, 46% of the voters took longer than five minutes, and 5% of the voters took longer than ten minutes. The parties are in agreement that there were lines off and on at the various precincts throughout the day, although we do not know exactly how many of the voters who took longer than five minutes did so when other voters were standing in line waiting their turn to cast a ballot.

Robert Stoker ("Stoker") was one of the witnesses who testified at trial. Stoker was an officer of elections at the Norris precinct in Anderson County on election day. Stoker testified that there were people standing in line to vote "off and on." Stoker has voted in Anderson County for thirty or forty years, and has worked elections there for six or seven years. According to Stoker, the ballot on August 3, 2006, was the "longest ballot in [his] memory." Stoker also testified that the Norris precinct used new computer equipment which caused some problems for voters who were unfamiliar with that equipment.

In *Forbes v. Bell,* 816 S.W.2d 716 (Tenn. 1991), the Supreme Court observed that:

[T]echnical non-conformity with election statutes will not necessarily void an election, as "such strictness would lead to defeat rather than uphold, popular election, and can not be maintained." *McCraw v. Harralson,* 44 Tenn. 34

---

4. The quoted version of Tenn.Code Ann. § 2–7–118 is the same version that was in effect on the date of the election at issue in this case.

(1867). Invalidating an election solely on the basis of technical omissions, much like failing "to cross a 't' or dot an 'i'," would effectively disenfranchise voters. *Foust v. May*, 660 S.W.2d 487, 490 (Tenn.1983).

*Forbes*, 816 S.W.2d at 721.

In *King v. Sevier County Election Comm'n*, 282 S.W.3d 37 (Tenn.Ct.App. 2008), *perm. app. denied Feb. 17, 2009*, this Court recognized that it is not sufficient to demonstrate just any statutory violation in order to prove entitlement to a new election. Rather, the violation must be a "serious" violation. *Id.* at 44. Under the facts of this case, we do not believe that voters exceeding the applicable five or ten minute time limit constitutes a "serious" statutory violation and, therefore, those votes are not illegal.

There is no doubt that the ballot for the August 3, 2006, general election was unusually lengthy. In fact, according to Stoker, it was the longest ballot he could recall in thirty to forty years. If we were to conclude that the votes of the voters who exceeded the statutory time limit were illegal, we would be disenfranchising as many as 46% of the registered voters.[5] It was not the voters who prepared this unusually lengthy ballot resulting in the voters being faced with an unusually large number of races in which to vote. The voters in this election were faced with a ballot presented to them that was of such length that 46% of the voters took longer than five minutes and 5% of the voters took ten minutes or more to vote. To hold these votes illegal would be to disenfranchise those voters for something over which they had neither the control nor the responsibility. We also note that there is

no evidence in this case that any voter who exceeded the time limit did so for an improper purpose or for any reason other than the length of the ballot. Accordingly, we conclude that under the facts of this case, the votes of the voters who exceeded the statutory time limit are not illegal votes, and we affirm the judgment of the Trial Court on this issue.

■ The second primary issue is whether the votes of those voters who were not asked to provide any identification prior to voting are "illegal" votes. The version of Tenn.Code Ann. § 2–7–112 in existence at the time of the election required each voter to sign an application for a ballot. The registrar then was to "compare the signature and information on the application with the signature and information on the duplicate permanent registration record." Tenn.Code Ann. § 2–7–112(a)(1) (Supp. 2006). Then:

> The registrar shall compare the voter's signature and information on the signature list with other evidence of identification supplied by the voter. If, upon comparison of the signature and other evidence of identification, it is found that the applicant is entitled to vote, the registrar shall initial the signature list.

Tenn.Code Ann. § 2–7–112(a)(2)(B) (Supp. 2006).

The statute further provides that for purposes of comparing signatures, evidence of identification shall include a driver's license, a valid voter's registration card, a social security card, a credit card, or "other document bearing the applicant's signature." Tenn.Code Ann. § 2–7–112(c). According to the statute in effect on the date of the election, if a voter was unable

---

**5.** It is unclear whether the 769 voters who exceeded ten minutes also are included in the 7,016 voters who exceeded five minutes. If the 769 voters who exceeded ten minutes were not included in the 7,016 who exceeded five minutes, we would be disenfranchising as many as 51% of the voters.

**691**

to present such additional identification, then that voter was required to execute an affidavit of identity. *See* Tenn.Code Ann. § 2–7–112(a)(2)(D) (Supp.2006).

The stipulated facts establish that voters were not asked to provide "other evidence of identification" at the South Clinton precinct. The stipulated facts also establish that of the 300 voters at the South Clinton precinct, 137 voted for Plaintiff and 143 for Layton.[6] There were other precincts that did not require other evidence of identification at various times throughout the day, although we do not know how voters at these locations voted. For present purposes only, we will assume that the total number of voters at precincts other than South Clinton who were not required to present other evidence of identification exceeds the 119 vote margin of victory in this case. Thus, the issue is whether the votes are illegal simply because the voter was not required to produce other evidence of identification.

The record fully supports a conclusion that the signatures of the registered voters on their applications were compared with those signatures on the signature list.[7] What Plaintiff claims is that these votes are illegal because additional documentary evidence was not required by the election registrar, and that production of this addi-

tional evidence of identification is mandated by Tenn.Code Ann. § 2–7–112.

Failing to require other forms of identification did not render these votes "illegal" under the circumstances of this case. As set forth previously, the parties stipulated that all of the voters in the election were indeed registered voters. At a minimum, this stipulation means that all 15,250 voters were entitled to vote as registered voters. A necessary corollary from this stipulation is that none of the voters were not entitled to vote. Given the parties' stipulation, no individual who voted in this election was not a registered voter. Thus, there is absolutely no proof that the result of the election would be different by even one vote had these registered voters been required to present additional evidence of identification, given that they were all properly registered voters. Because the result of the election would have been the same even if additional identification had been requested and presented, we do not hold any of these votes to be "illegal", and, therefore, the extreme remedy of voiding the election is not appropriate.

Because we affirm the judgment of the Trial Court that none of the votes at issue were "illegal", it necessarily follows that the Trial Court did not err when it refused to grant Plaintiff's motion to alter or amend the final judgment.

6. Had this been the only precinct which did not require identification cards, our inquiry would be at an end. While we acknowledge that typically when there are illegal votes the proper method is to assume all the illegal votes were cast for the contestant, this analysis is rendered moot when it is known exactly how the voters voted. For example, *if* the votes at the South Clinton Precinct were "illegal," we would subtract 137 votes from Plaintiff's totals and 143 from Layton's totals. This would result in Layton still winning the election.

7. Plaintiff challenges the lack of identification at three precincts: the South Clinton pre-

cinct, the Clinton Community Center precinct, and the West Hills precinct. At the Clinton Community Center, Plaintiff admits that for these voters, "their signatures on the applications were compared to the signatures in the book." As to the West Hills precinct, Plaintiff states that the "great majority of the voters had their signatures in the book, and so for the great majority, no documentary evidence was required...." The record does not indicate that the signatures on the applications were not compared to those in the voter registration book at the South Clinton precinct.

**692**

Even though we conclude that the votes at issue in this case are not illegal votes and the election results therefore stand, this result should not be interpreted as our minimizing the importance of compliance with the election statutes. The parties' stipulations played a significant role in our decision. As we stated in *King, supra:*

> [W]e do not condone violations of election statutes, even "highly technical" ones. Elections officials have a duty to follow the law, and to the extent that present practices do not comport with statutory requirements, those practices should be changed to bring them into compliance with the law. However, voiding an election is an extreme remedy.

*King,* 282 S.W.3d at 43.

The next issue is whether the Trial Court erred by refusing to award the Commission attorney fees pursuant to Tenn.Code Ann. § 2–17–115 (2003). This statute permits an award of attorney fees against a contestant if the contest or the appeal is "maliciously or frivolously prosecuted." Given the procedural history of this case and because there clearly were statutory violations at issue, even though we have held those statutory violations were not sufficiently serious so as to render the votes illegal, we conclude that the Trial Court did not err when it determined that this case had not been brought maliciously or prosecuted frivolously. For that same reason, we decline to hold that this appeal is frivolous and award either the Commission or Layton attorney fees incurred on appeal.

### Conclusion

The judgment of the Trial Court is affirmed, and this case is remanded to the Trial Court solely for collection of the costs below. Costs on appeal are taxed to the Appellant, David A. Stuart, and his surety, if any, for which execution may issue, if necessary.