IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 17, 2012 Session

## REGINA MORRISON NEWMAN, ET AL. v. SHELBY COUNTY ELECTION COMMISSION

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH10-1538      Arnold B. Goldin, Chancellor**

---

**No. W2011-00550-COA-R3-CV - Filed February 13, 2012**

---

This is an election contest case brought pursuant to Tennessee Code Annotated Section § 2-17-101, *et seq*. Appellants, unsuccessful candidates for various offices in the August 5, 2010 Shelby County general election, filed suit against the Appellee Shelby County Election Commission. Appellants aver that the election process was incurably flawed to the extent that Appellants and the citizens of Shelby County were denied a free and equal election as required by Article I, Section V of the Tennessee Constitution. The trial court granted an involuntary dismissal, under Tennessee Rule of Civil Procedure 41.02(2), finding that Appellants' proof was insufficient to prove that the election was incurably uncertain. We affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed.**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and David R. Farmer, J., joined.

James G. Stranch, III and James G. Stranch, IV, Nashville, Tennessee, and David Cocke, Memphis, TN for the appellants, Regina Morrison Newsom, Minerva Johnican, Venita Marie Martin, Shep Wilbun, Corey Maclin, Randy L. Wade, Coleman Thompson, Ricky Dixon, Sondra Becton, and Glenn Wright.

John L. Ryder, Pablo Adrian Varela, and Samuel J. Muldavin, Memphis, Tennessee, for the appellee, Shelby County Election Commission.

## OPINION

Regina Morrison Newman was an unsuccessful candidate for the office of County Trustee during the general election held in Shelby County on August 5, 2010. According to

the record, Ms. Newman lost the election by 4,509 votes.[1] Minerva Johnican was an unsuccessful candidate for the office of Criminal Court Clerk; she lost that contest by 4,886 votes. Venita Marie Martin was a candidate for the office of Circuit Court Judge for Division VIII in the August 5, 2010 election. Ms. Martin was unsuccessful, losing by 24,787 votes. Shep Wilbun was a candidate for the office of Juvenile Court Clerk and was unsuccessful, losing by 12,462 votes. Corey Maclin was an unsuccessful candidate for the Register of Deeds position; he lost the election by 27,720 votes. Randy Wade was a candidate for Sheriff in the August 5 election and was unsuccessful, losing by 6,602 votes. Ricky Dixon was a candidate for the office of Circuit Court Clerk; he lost by 17,431 votes. Sondra Becton was an unsuccessful candidate for the office of Probate Court Clerk; she lost by 6,519 votes. Glenn Wright (together with Ms. Newman, Ms. Johnican, Ms. Martin, Ms. Becton and Messrs. Wilbun, Maclin, and Wade, "Plaintiffs," or "Appellants")[2] was an unsuccessful candidate for Criminal Court Judge for Division 3, losing by 1,516 votes.

Following the August 5, 2010 election, under Tennessee Law, the Shelby County Election Commission (the "Commission," or "Appellee") had until August 26, 2010 to certify the results of the election pursuant to Tennessee Code Annotated Section 2-8-113.[3] Although the deadline for certification was not until August 26, 2010, the Commission certified the election early on August 19, 2010. Tennessee Code Annotated Section 2-17-105 provides that a "complaint contesting an election under §2-17-101 shall be filed within five (5) days after certification of the election." On August 24, 2010, Appellants filed an emergency petition for temporary restraining order, injunctive relief, and declaratory judgment, contesting the August 5, 2010 election. An amended petition was filed on August

---

[1] The margin of loss for each candidate is set out in the *Tabulation of Votes Recorded for the State and Federal Primary and County Election*, which is part of our record.

[2] Ricky Dixon, a named plaintiff in the trial court, has chosen not to appeal.

[3] Tennessee Code Annotated Section 2-8-113 provides, in relevant part, as follows:

> (a) On the fourth Thursday after a primary election, the state coordinator of elections shall publicly calculate and compare the votes received by each person and declare who has been nominated for office in the primary or elected to the state executive committee. The candidates who receive the highest number of votes shall be declared elected or nominated; provided, that in order for any person to receive a party nomination by write-in ballots, such person must receive a number of write-in votes equal to or greater than five percent (5%) of the total number of registered voters of the district. However, this section shall not apply where there are candidates for the office involved listed on the official ballot.

25, 2010. The amended petition names the Commission, Shelby County Government, and the winning candidates for each of the offices sought by each of the Appellants as defendants.

The amended petition, which was filed pursuant to Tennessee Code Annotated Section 2-17-101 *et seq.*, challenges the August 5, 2010 election asserting that the "election process was incurably flawed to the extent that Plaintiffs and [the] citizens of Shelby County were denied a free and equal election as required by Article I, Section V of the Tennessee Constitution." In their prayer for relief, Appellants requested the Chancery Court to declare the August 5, 2010 election a nullity on two grounds: (1) "as a result of the current fraud, illegality, and irregularities which have occurred so far during the early voting process;" and (2) "as a result of the fraud, illegality, and substantial irregularities which have occurred during the voting process and afterward." In their petition, Appellants alleged numerous irregularities in the August 5, 2010 election, including: (1) "vote swap," where voters would touch their candidate's name on the electronic touch-screen, only to have another candidate's name appear; (2) incorrect "party identifiers," where candidates in non-partisan races would incorrectly be identified as Republicans or Democrats; (3) a malfunction where incorrect data designated citizens who had voted in the May 2010 election as having early voted in the August 2010 election and that, as a result, some 5,400 voters who arrived at the polls to vote on August 5 were incorrectly told that they had already voted; (4) media coverage of the arrest of two individuals for having allegedly voted twice in a 2006 election, which Appellant's asserted had a "chilling effect" on voters who, as a result of the malfunction involving the uploading of incorrect data were incorrectly told that they had already voted; (5) at the majority of voting locations, the voter tallies retrieved by Democratic poll watchers were inconsistent with the voter tallies subsequently given by the Commission; (6) inconsistent entries of provisional ballots in the GEMS audit log; (7) numerous improprieties regarding the handling of poll tapes all in violation of Tennessee Code Annotated Section 2-8-108;[4] (8) allegations that many voting machines were not sealed; (9) the existence of a

---

[4] Tennessee Code Annotated Section 2-8-108 provides:

> (a) The commission shall preserve all paper ballots for six (6) months after the election to which they were cast or offered to be; cast and may then dispose of them. During the period in which they are preserved, the packages of ballots shall be kept securely locked and may be opened and the ballots examined only on court order or under chapter 18 of this title.
>
> (b) All other election documents such as applications for all ballots, spoiled and rejected ballots, voter affidavits, records of assistance to voters, etc., shall be preserved by the county election commission for six (6) months or

(continued...)

"Ghost Race," which could be used to manipulate the election results; and (10) that the number of votes cast in the August 5, 2010 election exceeded the number of persons who voted in the election.

Tennessee Code Annotated Section 2-17-106 requires the trial of an election contest to be held "not less than fifteen (15) nor more than fifty (50) days from the day the complaint is filed and not less than ten (10) days after the complaint is served on the defendant." As a result of this statutory requirement, the discovery schedule was compressed in this case. In fact, the record reveals that some depositions were taken during the trial, which was held on October 4, 6, and 7, 2010. Before the hearing, on October 1, 2010, the individual defendants (i.e., the winning candidates) filed a motion to dismiss. After considering memoranda of law and hearing oral arguments, and upon Appellants' representation in open court that the case was purely a "Prong II Emery" case (*see* discussion *infra*), the Chancellor granted the motion of the individual defendants and dismissed them, along with Shelby County Government, from the case, leaving the Commission as the sole Defendant/Appellee.[5] The issue of whether the individually named defendants were properly dismissed is not before us. Furthermore, the Appellants have not contested their

---

[4](...continued)
> longer if so ordered by a court or by the coordinator of elections. All election documents pertaining to a federal election shall be preserved by the county election commission for twenty-two (22) months.

[5] Concerning which *Emery* Prong is at issue, the following discussion occurred at the hearing on the motion to dismiss:

> COURT: Since the allegation that you [Appellants] make is the Prong-two Emery allegation. . . . I mean assuming that those allegations can be proven, it seems that the relief would be that you're asking for is a new election.
>
> MR. STRANCH [Appellants' lawyer]: Correct.
>
> *                    *                    *
>
> COURT: All right. Well, I think that everyone—I think I can agree that this case is being tried not on the individual races but on the basis of Plaintiffs' argument that the entire election should be declared null and void as a result of fraud, illegality, and irregularities, which are alleged to have occurred and that the case is going to either rise or fall on that allegation.

-4-

representation in the trial court that they were proceeding only on Prong II of ***Emery***, and that Prong I arguments were, consequently, waived (*see* further discussion below).

At the conclusion of the Appellants' proof at the October hearing, the Commission moved for involuntary dismissal under Tennessee Rule of Civil Procedure 41.02(2).[6] The motion was granted in a bench ruling by the Chancellor on October 7, 2010. The Commission was ordered to submit a proposed order, including findings of fact and conclusions of law. This proposed order was forwarded to Appellants, who did not respond for several weeks. Finally, in December 2010, the proposed order was submitted and the trial court entered its findings of fact and conclusions of law on January 14, 2011. An additional post-trial matter relating to the request for attorney's fees by the individually named defendants under Tennessee Code Annotated Section 2-17-115 was considered and denied. A final order was entered on February 24, 2011. Appellants appeal, raising three issues for review as stated in their brief:

> 1. Whether the trial court used an incorrect legal standard by requiring Plaintiffs-Appellants to present evidence of intentional misconduct to overturn the results of the election at issue in this case.

> 2. Whether the trial court improperly declined to consider the possibility that the voting irregularities identified by Plaintiffs-Appellants rendered "incurably uncertain" the results of certain selected races as opposed to the election generally.

> 3. Whether the trial court improperly required too high a showing of a definitive causal link between the number of votes

_____

[6] Tennessee Rule of Civil Procedure 41.02(2) provides:

> After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court shall reserve ruling until all parties alleging fault against any other party have presented their respective proof-in-chief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court grants the motion for involuntary dismissal, the court shall find the facts specially and shall state separately its conclusion of law and direct the entry of the appropriate judgment.

implicated by a particular election irregularity and the effect that irregularity had on the certified results of the election.[7]

We first note that Appellate courts use the standard found in Tennessee Rule of Appellate Procedure 13(d) "to review a trial court's disposition of a Tenn. R. Civ. P. 41.02(2) motion because the trial court has used the same reasoning to dispose of the motion that it would have used to make a final decision at the close of all the evidence." ***Burton v. Warren Farmers Co-op***, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002). We review the trial court's findings of fact *de novo* upon the record with a presumption of correctness, unless the preponderance of the evidence is otherwise or unless the trial court has committed an error of law affecting the outcome of the case. ***Id***.

---

[7] As a point of practice, we note that Tennessee Rule of Appellate Procedure 24(a) provides, in relevant part, that:

> The following papers filed in the trial court are excluded from the record: (1) subpoenas or summonses for any witness or for any defendant when there is an appearance for such defendant; (2) **all papers relating to discovery, including depositions, interrogatories and answers thereto, reports of physical or mental examinations, requests to admit, and all notices, motions or orders relating thereto**; (3) any list from which jurors are selected; and (4) trial briefs; and (5) minutes of opening and closing of court. Any paper relating to discovery and offered in evidence for any purpose shall be clearly identified and treated as an exhibit. **No paper need be included in the record more than once.**

> ***Id***.

> This record contains several volumes, many of which are comprised of only discovery materials, including interrogatories, requests for documents, and answers thereto. In addition, this record contains the same papers numerous times. It is too often the case that an Appellant includes all filings made in the trial court and every portion of the transcript of the hearing (including arguments of counsel) in contravention of the foregoing Rule of Appellate Procedure. The problem with inclusion of extraneous filings that are clearly excluded from the appellate record is that it places upon this Court a duty that falls to the Appellant—to prepare a correct and complete record on appeal. Tenn. R. App. P. 24(b). In making that record, the Appellant should adhere to the mandates contained in Tennessee Rule of Appellant Procedure 24(a). This Court endeavors to file its opinions in a timely manner; however, when placed in the position of having to review volumes of extraneous, unnecessary, and irrelevant filings, our goal is hindered and the interests of judicial economy are stymied.

This matter was filed as an election contest. *See Hatcher v. Chairman, Shelby County Election Comm'n*, 341 S.W.3d 258, 263 (Tenn. Ct. App. 2009) (pursuant to Tennessee Code Annotated Section 2–17–105, an election contest is filed " after the election"). This court has succinctly summarized the grounds for an election contest:

> In *Forbes v. Bell*, 816 S.W.2d 716 (Tenn. 1991), our Supreme Court discussed at length the procedures for having an election set aside pursuant to Tenn. Code Ann. § 2–17–101, *et seq*. The *Forbes* Court began by observing that there are two grounds upon which an election contest can be based. The first ground involves a claim that the election was valid, but that the contestant, rather than the contestee, would be the winner if the outcome was properly determined. *Id*. at 719. If the contestant is successful in court, the proper relief in this type of case is a judgment declaring the contestant the winner. The second ground is a claim that the election was null and void. *Id*. The proper remedy in this second situation, if the contestant is successful in court, is to order a new election.

*Stuart v. Anderson County Election Comm'n*, 237 S.W.3d 297, 303 (Tenn. Ct. App. 2007).

The first ground, i.e., "a claim that the election was valid, but that the contestant, rather than the contestee, would be the winner if the outcome was properly determined," addresses counting votes. *Id*. To prevail on this ground, "an election contestant must 'specifically point out each and every vote that was fraudulently or illegally cast on behalf of the contestee and against [the contestant].'" *Forbes*, 816 S.W.2d at 719 (quoting *Shoaf v. Bringle*, 241 S.W.2d 832, 833 (Tenn. 1951)). There is no allegation in this matter that anyone cast an illegal vote, nor do the Appellants' seek, as a form of relief, a declaration that he or she is the winner of his or her specific contest. Rather, in the instant case, we are only concerned with the second ground, i.e., that the election be declared null and void.

Under Tennessee law, a court has the power to void an election on either of two grounds. First, "where some ballots are found to be illegal, [and] the number of illegal votes cast is equal to, or exceeds the margin by which the certified candidate won." *Forbes*, 816 S.W.2d at 719–20 (citing *Emery v. Robertson County Election Comm'n*, 586 S.W.2d 103, 109 (Tenn. 1979)) [hereinafter referred to as *Emery* Prong I]. Secondly, "upon a sufficient quantum of proof that fraud or illegality so permeated the election as to render it incurably uncertain, even though it can not be shown to a mathematical certainty that the result might have been different." *Forbes*, 816 S.W.2d at 719–20 (quoting *Emery*, 586 S.W.2d at 109) [hereinafter referred to a *Emery* Prong II].

In explaining the two grounds for election contests, the *Forbes* Court relied upon the case of *Emery v. Robertson Co. Election Comm'n*, 586 S.W.2d 103 (Tenn. 1979). The *Emery* Court established a two-prong test. *Emery* Prong I, which is not triggered in this case (*see* discussion above and *infra*), is a challenge to the individual, specific races conducted during the election.[8] Under Prong I, the plaintiff has the burden to prove that "the number of illegal ballots cast equals or exceeds the difference between the two candidates receiving the most votes." *Emery*, 586 S.W.2d at 108. Mere speculation is not enough. Despite the fact that the Appellants clearly proceeded at trial under only Prong II of *Emery* (even to the point of dismissal of the individually named defendants who had won their respective races), and have raised no appellate issues concerning the waiver of Prong I or dismissal of the individual defendants, Appellants, nonetheless, present several arguments in their brief that seem to trigger Prong I (i.e., argument concerning the actual numbers of votes cast and the margin of loss). Specifically, the Appellants cite to Appellant Glenn Wright's case. As noted above, Mr. Wright lost the election for Criminal Court Judge for Division 3 by only 1,516 votes. Appellants' brief seems to argue that the narrow margin of loss somehow bears on the theory espoused at trial (i.e., *Emery* Prong II). As discussed above, the question of whether the number of votes cast equals or exceeds the difference between the two candidates who received the most votes is not an inquiry under *Emery* Prong II, only under Prong I. Mr. Wright, along with the other Appellants, did not object at trial to the case proceeding only under Prong II of *Emery*. *Waters v. Farr*, 291 S.W.3d 873, 918 (Tenn. 2009) (stating that issues not raised in the trial court are waived on appeal); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Having not objected below, neither Mr. Wright, nor the other Appellants can be heard to complain on appeal.

Although Appellants' Prong I arguments are waived, it is apparent that the question of causality cannot be separated from the inquiry under either *Emery* Prong I or Prong II. However, a Prong II attack requires a less stringent standard as the plaintiff need not show specific numbers of votes. *Emery* Prong II, upon which the instant case turns, allows a plaintiff to challenge an election contest by proving that "fraud or illegality so permeated the conduct of the election as to render it incurably uncertain." *Emery,* 586 S.W.2d at 109. Thus, the grounds for voiding an election involve: (1) fraud and illegality rendering the election uncertain or (2) enough illegal ballots having been cast to call the election into doubt. Again, there is no allegation in this matter that anyone cast an illegal vote, so the second ground for voiding the election is not met. Therefore, to void the August 5, 2010

---

[8] At the outset of its ruling from the bench, the trial court re-iterated that "we're not dealing with single elections in this case based on the margin of victory between the candidates . . . but dealing with the entire election." There was no objection to this statement.

election, Appellants must show that "the election should be invalidated because it was so permeated with fraud and illegality that it cannot be said to fairly reflect the will of the voters." *Forbes*, 816 S.W.2d at 720. "Thus, whether there is proof of actual fraud only, or violations of statutory safeguards only, or a combination of the two, the issue is whether or not those acts, viewed cumulatively, compel the conclusion that the election did not express the free and fair will of the qualified voters." *Emery*, 586 S.W.2d at 109. Consequently, a plaintiff must show a causal connection between the illegalities asserted and the uncertainty of the election results.

In *King v. Sevier County Election Comm'n*, 282 S.W.3d 37, 46 (Tenn. Ct. App. 2008), this court noted that examples of cases that voided elections include *Shoaf* (alleging "intimidation and dures[s]" at the polls, and a conspiracy between officials and candidate to provide insufficient ballots in opponent's stronger precincts); *State ex rel. Davis v. Kivett*, 177 S.W.2d 551 (Tenn. 1944) (alleging a conspiracy to "steal the election" through intimidation and the use of fraudulent votes); and *Hollis v. State ex rel. Vaughan*, 237 S.W.2d 952 (Tenn. 1951) (alleging a conspiracy to "steal the election" by the procurement of "fictitious absentee ballots" and the printing of fraudulent ballots that omitted some candidates' names). Thus, the level of fraud and illegality necessary to void an election is steep. Election contests are about the manner and form of the election itself or the qualifications of the winner to hold the office to which she or he has been elected. *See Hatcher v. Bell*, 521 S.W.2d 799, 802 (Tenn.1974). There is no doubt that the August 5, 2010 election was not perfect, and that mistakes were made by the Commission; however, mistakes, without evidence of fraud, illegality, or a causal connection between the mistakes and the uncertainty of the election results, will not void an election under Prong II of *Emery*. The vote of the people is the most significant step in the election process. *See Snow v. City of Memphis*, 527 S.W.2d 55, 64 (Tenn. 1975) ("The final validating step by the people is the most significant action in the entire [constitutional] amending process."). Consequently, "courts should be . . . reluctant to take the step of declaring an election invalid." *Forbes*, 816 S.W.2d at 724. "[V]oiding an election is an extreme remedy." *King*, 282 S.W.3d at 43. The paramount question is whether there is evidence in this record that the election results did not reflect the will of the electorate. No election is perfect, and honest mistakes sometimes occur. *See Ingram*, 316 S.W.2d at 33. However, "[h]onest mistakes . . . will not void an election unless they affect the result or at least render it uncertain." *Forbes*, 816 S.W.2d at 720.

After reviewing the record, we agree with the trial court's findings that there is a complete lack of evidence on several grounds asserted by the Appellants in their amended petition. Concerning the allegation that there were numerous incidents of "vote swap," i.e., where voters would touch their candidate's name on the electronic touch screen only to have another candidate's name appear, there was no evidence in the trial transcript to support this allegation. In addition, the allegation that there were numerous instances where "party

identifiers" incorrectly identified the candidates in non-partisan races as Republicans or Democrats is unsupported in the record as no testimony or evidence was offered to support the allegation.

Appellants also aver that a malfunction occurred where incorrect data indicated that certain citizens had early voted, when they had not. Although a mistake did occur with the electronic poll books (*see* below), Appellants assert that these voters, having been turned away, did not attempt to vote and so were denied suffrage. In support of this allegation, the Appellants proffered the testimony of Emmie Johnson, a poll worker at the Glenview location. Ms. Johnson attempted to testify that there were several voters at that precinct who were turned away on grounds that they had early voted, when they allegedly had not. However, the trial court sustained the Commission's hearsay objection, thus negating the substantive portions of Ms. Johnson's testimony. The Appellants do not appeal the trial court's evidentiary ruling on Ms. Johnson's testimony. Despite the trial court's ruling, the Appellants did not offer the testimony of any citizen that was actually turned away from the October 5 vote based upon incorrect information that the citizen had already exercised his or her right by early voting. Moreover, there was no evidence concerning the actual number of voters turned away based upon mistaken information about early voting.

The Appellants' allegation that media coverage of the arrest of two individuals who had attempted to vote twice in the 2006 election is also unsubstantiated in the record. Specifically, there was no evidence to support a finding that any voter in the October 5 election was affected by the 2006 incident. Appellants presented no evidence to support their allegation of inconsistent entries of provisional ballots in the GEMS audit log. Likewise, there is no evidence in the record to support a finding that there was any "Ghost Race," which could have manipulated the October 5 results.

In addition, the Appellants averred that there were several voting machines that were not properly sealed. Although the Commission concedes that there were, in fact, some machines that were not sealed, the Appellants offered no testimony or evidence to suggest that this fact was anything but human error. Specifically, Appellants offer no evidence to support a finding that failure to seal all of the voting machines was the result of fraud or illegality. Furthermore, Appellants provided no evidence that failure to seal all voting machines resulted in any voter being denied either an opportunity to vote, or that this error resulted in a loss of any votes cast.

Having discussed the lack of evidence on certain theories espoused by the Appellants, we now turn to address the remaining allegations and the evidence that was, in fact, presented. Julie Anne Kempf, a former King County, Washington Election Administrator,

was tendered by Appellants as an expert in election procedure.[9] Ms. Kempf testified, in relevant part, that she had three main concerns with the manner in which the August 5 election was conducted by the Commission, namely:

> 1. The electronic poll books used for the election had the incorrect voter history uploaded;
>
> 2. The logic and accuracy test performed by the Commission to check the accuracy of the tabulation, was unacceptable as a means for ensuring a fair and accurate tabulation of votes; and
>
> 3. The number of votes cast exceeded the number of persons who voted.

However, Ms. Kempf further testified that she had discovered no intentional fraud, illegality, or conspiracy on the part of the Commission to manipulate the election.

It is undisputed that the Commission used electronic poll books for the August 5, 2010 election. It is also undisputed that the poll books used on August 5 had the incorrect history data uploaded. Specifically, the list of voters who were ineligible to vote because they had voted early was incorrect because the May 2010 early voting data was incorrectly loaded onto the electronic poll books instead of the early voting list for the August 5 election.

Dennis Boyce, a computer system analyst who manages the information system department for the Commission, testified that he incorrectly loaded the early voting data; however, he explained that he had not intentionally erred in so doing, nor did he have any suspicion that he had been "set up" to make the mistake. In short, Mr. Boyce had no

---

[9] No issue has been raised concerning either Ms. Kempf's qualifications as an expert, or the trial court's allowing her testimony in this case. That being said, it is well settled that:

> Expert opinions are not ordinarily conclusive in the sense that they must be accepted as true on the subject of their testimony, but are generally regarded as purely advisory in character; the [triers of fact] may place whatever weight they choose upon such testimony and may reject it, if they find that it is inconsistent with the facts in the case or otherwise unreasonable.

*Cocke Co. Bd. of Highway Comm'rs v. Newport Util. Bd.*, 690 S.W.2d 231, 235 (Tenn. 1985) (quoting Am.Jur.2d Expert and Opinion Evidence § 138 (1967)); *accord* *Gibson v. Ferguson*, 562 S.W.2d 188, 189–90 (Tenn. 1976).

knowledge of any intention to keep anyone from the polls on August 5.

Mr. Albert Holmes, who has been employed by the Commission for approximately seventeen years, testified that he learned of the error with the poll books when he performed a routine logic and accuracy test on the morning of August 5, 2010, before the polls opened. Mr. Holmes informed Mr. Boyce of the problem at approximately 7:04 a.m. on August 5. Mr. Boyce testified that, within fifteen minutes, he discovered the precise cause of the problem, which was a script error that erroneously identified May voters as early August voters. After this discovery, the Commission immediately began to take remedial steps. First, the Commission notified the polling officials at each precinct of the problem and instructed the precinct workers to allow affected voters to cast "fail safe" ballots. Next, the Commission set out to reprogram "each CF card [i.e., voter access card] in each EPB [i.e., electronic poll book] throughout Shelby County." Mr. Holmes testified that he went to several office supply stores to buy as many CF readers as he could in order to quickly affect a remedy. However, after reprogramming the CF cards for sixty or sixty-five precincts, Mr. Holmes testified that it became clear that reprogramming all of the affected CF cards could not be done and that the use of the fail safe ballots was the most effective way to mitigate the problem.

The record indicates that the accidental uploading of incorrect information resulted in the erroneous identification of approximately 5,400 voters as having early voted. However, as a result of the Commission's remedial measures, *supra*, 2,025 of the 5,400 possibly affected voters were able to cast their ballots in the August 5 election. Although we know from the record that 2,025 of the affected voters did, after the remedial measures, cast their votes, Appellants offered no testimony or evidence that any of the other 3,375 affected voters were actually denied suffrage. From the totality of the circumstances, we conclude that the evidence does not preponderate against the trial court's finding that the uploading of incorrect data was the result of human error and did not rise to the level of fraud, illegality, or uncertainty necessary to satisfy the second *Emery* prong. In short, the Appellants have failed to show a causal link between this mistake and any uncertainty regarding the election results.

Concerning Ms. Kempf's allegation that the logic and accuracy test performed by the Commission to check the accuracy of the tabulation was unacceptable as a means for ensuring a fair and accurate tabulation of votes, the trial court specifically found that, "[w]hile Ms. Kempf may have performed the test differently, such criticism does not render Mr. Holmes' method illegal or improper nor does it provide a sufficient basis to void the August 5, 2010 election." We agree. A difference in opinion as to the means of accomplishing a task is not, *ipso facto*, proof that one method is superior. Without specific testimony as to why Mr. Holmes' method would result in illegal or improper results, this

Court cannot conclude that the trial court's finding was against the weight of the evidence.

Ms. Kempf's allegation that the number of votes cast exceeds the number of voters was countered by the deposition testimony of Shelby County Election Administrator Richard Holden, which deposition was admitted into evidence. Mr. Holden explained that the number of cards cast in the election does not indicate the number of voters because the number of ballot pages is counted, not the number of voters. Specifically, military and absentee ballots are anywhere from one to three pages; therefore, the number of cards will not match the number of voters. Mr. Holden's testimony was not disputed on this point.

From the record as a whole, we conclude that Appellants have failed to meet their burden to show that "fraud or illegality so permeated the conduct of the election as to render it incurably uncertain." *Emery*, 586 S.W.2d at 109. Consequently, and for the foregoing reasons, we affirm the order of the trial court. Costs of this appeal are assessed, jointly and severally, to the Appellants, Regina Morrison Newman, Minerva Johnican, Venita Marie Martin, Shep Wilbun, Corey Maclin, Randy Wade, Sondra Becton, Glenn Wright, and their respective sureties.

_____
J. STEVEN STAFFORD, JUDGE